# EXHIBIT A

19STCV26274

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Mel Red Recana

Electronically FILED by Superior Court of California, County of Los Angeles on 07/29/2019 11:42 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

Christine Haw (SBN 289351)
Email: chaw@slpattorney.com
Tionna Dolin (SBN 299010)
Email: tdolin@slpattorney.com
**STRATEGIC LEGAL PRACTICES, APC**
1840 Century Park East, Suite 430
Los Angeles, CA 90067
Telephone:    (310) 929-4900
Facsimile:    (310) 943-3838

Attorneys for Plaintiffs
JASON J. ARNOLD and MELISSA L. ARNOLD

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| JASON J. ARNOLD and MELISSA L. ARNOLD,<br><br>Plaintiffs,<br><br>vs.<br><br>FCA US LLC; ORANGE COAST CHRYSLER DODGE JEEP RAM; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>Hon.<br>Dept.<br><br>**COMPLAINT FOR VIOLATION OF STATUTORY OBLIGATIONS**<br><br>JURY TRIAL DEMANDED |

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**

Plaintiffs allege as follows:

## PARTIES

1.      As used in this Complaint, the word "Plaintiffs" shall refer to Plaintiffs JASON J. ARNOLD and MELISSA L. ARNOLD.

2.      Plaintiffs are residents of Los Angeles County, California.

3.      As used in this Complaint, the word "Defendant" shall refer to all Defendants named in this Complaint, unless otherwise specified.

4.      Defendant FCA US LLC ("Defendant FCA") is a corporation organized and in existence under the laws of the State of Delaware and registered with the California Department of Corporations to conduct business in California.  At all times relevant herein, Defendant was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Los Angeles County.

5.      Defendant ORANGE COAST CHRYSLER DODGE JEEP RAM ("Defendant OC") is an unknown business entity organized and in existence under the laws of the State of California.  At all times relevant herein, Defendant was engaged in the business of selling automobiles and automobile components, and servicing and repairing automobiles in Los Angeles County.

6.      Plaintiffs are ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 10. They are sued pursuant to Code of Civil Procedure section 474.   When Plaintiffs become aware of the true names and capacities of the Defendants sued as DOES 1 to 10, Plaintiffs will amend this Complaint to state their true names and capacities.

## FACTUAL BACKGROUND

7.      On or about June 2, 2014, Plaintiffs purchased a 2014 Dodge Journey vehicle identification number 3C4PDCBG8ET257089 (hereafter "Vehicle" or "Subject Vehicle"), from Defendant OC, which was manufactured and or distributed by Defendant FCA.  The Vehicle was purchased or used primarily for personal, family, or household purposes.

1

1    Plaintiff purchased the Vehicle from a person or entity engaged in the business of
2    manufacturing, distributing, or selling consumer goods at retail.

3        8.      In connection with the purchase, Plaintiff received an express written warranty,
4    including a 3 year/36,000 miles bumper to bumper warranty and a 5 year/100,000 miles
5    powertrain warranty, which covers the engine and transmission. Defendant undertook to
6    preserve or maintain the utility or performance of the Vehicle or to provide compensation if
7    there is a failure in utility or performance for a specified period of time. The warranty
8    provided, in relevant part, that in the event a defect developed with the Vehicle during the
9    warranty period, Plaintiffs could deliver the Vehicle for repair services to Defendant's
10   representative and the Vehicle would be repaired.

11       9.      During the warranty period, the Vehicle contained or developed defects,
12   including but not limited to, defects related to the electrical system; defects related to the
13   totally integrated power module (TIPM); defects causing the maps to be intermittently locked;
14   defects causing the failure and/or replacement of the radio assembly; defects causing internal
15   radio malfunction; defects requiring the performance of Recalls R61 and/or R65; defects
16   requiring the updating of the radio software; defects causing the sunroof to leak; defects
17   causing the GPS (global positioning satellite) to malfunction; defects requiring radio updates;
18   defects causing a bad smell from the HVAC; defects causing the illumination of the check
19   engine light ("CEL"); defects causing evap leak(s); defects requiring the powertrain control
20   module ("PCM") to be flashed; defects causing the storage of Diagnostic Trouble Code
21   ("DTC") P0456; defects related to the sunroof; and/or any other defects described in the
22   Vehicle's repair history. Said defects substantially impair the use, value, or safety of the
23   Vehicle.

24       10.     Plaintiffs suffered damages in a sum to be proven at trial in an amount that is
25   not less than $25,001.00.

26       11.     All acts of corporate employees as alleged, were authorized or ratified by an
27   officer, director or managing agent of the corporate employer.

28

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

12.     Each Defendant whether actually or fictiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

### The Totally Integrated Power Module (TIPM) Defect

13. The Subject Vehicle was factory-equipped with a Totally Integrated Power Module ("TIPM") which is located under the hood in the vehicle engine compartment. Defendant FCA equipped the Subject Vehicle with a TIPM.

14.     The TIPM is the chief component in the Subject Vehicle's power distribution systems and consists of a computer, relays, fuses, and controls. The TIPM provides the primary means of voltage distribution and protection for the entire vehicle and Defendant FCA acknowledges that the TIPM is intended to provide safe, reliable, and centralized distribution of power to the Subject Vehicle's electrical systems.

15.     The electrical systems that receive power distributed by the TIPM include the vehicles' safety systems, security system, ignition system., fuel system, electrical powertrain, and the vehicles' comfort and convenience systems. These systems control components including the air bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and doors.

16.     The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

17.     As a result of the TIPM defect, the Subject Vehicle has had the following issues:

a. malfunction of the radio assembly; malfunction PCM; illumination of the check engine light;

b. Multiple electrical issues; and,

c. Numerous recalls.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

3

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE A30, LOS ANGELES, CA 90067

18.     The TIPM in the Subject Vehicle is likely to cause a variety of electrical issues such as a loss of headlight function, stalling, and unexpected distractions, such as the vehicle's horn or alarm sounding while on a roadway, which may each increase the risk of injury for the driver, passengers, or others on the roadway. The defective TIPM imposes a substantial safety risk to the operator the vehicle and surrounding drivers.

19.     Defendant FCA has instructed employees in multiple divisions to investigate the TIPM defect. As recently as spring 2012, teams were investigating vehicles equipped with the TIPM not starting, having difficulty starting, and stalling attributed to a malfunction fuel pump relay integral to the TIPM printed circuit board.

### Defendant FCA's Knowledge of the TIPM Defect

20.     Defendant FCA had superior and exclusive knowledge of the TIPM defects, and knew or should have known that the defects were not known by or reasonably discoverable by Plaintiff before Plaintiff purchased or leased the Subject Vehicle.

21.     Defendant FCA's knowledge of the TIPM defects since at least 2007 is demonstrated by the numerous consumer complaints submitted to FCAUS LLC and to NHTSA, multiple TIPM-related recalls and technical service bulletins, two NHTSA investigations into TIPM-related complaints, Defendant FCA's exhaustive pre-release vehicle testing, and FCA US LLC's exclusive access to post-sale data about the performance of and repairs made to its vehicles. The use of limited recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and improper denial of the TIPM defect by Defendant FCA.

22.     Defendant FCA vehicles have been plagued with severe TIPM problems for the past decade.

23.     As a result, Defendant FCA has initiated multiple TIPM-related recalls to address safety or emissions concerns.

24.     An automotive manufacturer's service bulletin typically takes time to develop and issue because the manufacturer needs to identify and understand the problem, develop and

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1    test the new repair instructions, and draft and finalize the bulletin before distributing it to

2    dealerships.

3        25.    The defect is so widespread that TIPM replacement parts have often been on

4    national backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or

5    months to have their TIPMs replaced. In the meantime, Defendant FCA's dealerships and

6    auto-technicians are advising many drivers not to drive their vehicles until the TIPM is

7    replaced, due to safety risks.

8        26.    In October 2005, Defendant FCA issued Recall )5V-461 for model year

9    ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e ., "flash") the TIPM-6 with new

10   software to cure a safety-related defect.

11       27.    The defect was that the TIPM-6 could have incorrect transfer case calibration

12   set points. As a consequence, the transfer case could shift into neutral without warning and, if

13   the parking brake were not engaged, the vehicle could roll away.

14       28.    Defendant FCA admitted that because of the defect, "the vehicle could roll

15   away with the transmission in the Park position and cause a crash without warning."

16       29.    This defect shows that Defendant FCA was aware of the dangerous, life-

17   threatening consequences of a defective TIPM. Yet, despite this knowledge, Defendant FCA

18   manufactured the next generation TIPM, the TIPM-7, without resolving the module's

19   propensity to cause life threatening crashes.

20       30. In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary

21   Evaluation PE07-027.

22       31.    The ODI had received 53 consumer complaints alleging incidents of engine

23   stalling in MY 2007 Jeep Wrangler vehicles, prompting the evaluation. Most of the stalls

24   occurred suddenly, and in 12 of them a loss of electrical power causing a loss of vehicle

25   lighting coincided with the stalls.

26       32. The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety

27   consequences of the defect in the subject vehicles.

28

33. The ODI agreed to close the evaluation when, on July 3, 2007, FCA US LLC agreed to recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles (NHTSA Recall 07V-291).

34. To remedy the stalling problem, Defendant FCA agreed to reprogram the TIPM in the subject vehicles with revised software. Defendant FCA admitted that there was an "issue" with the TIPM "that could result in an engine stall while driving," which could "cause a crash without warning."

35. At the time the evaluation was closed, the ODI had received 230 consumer complaints, two of which involved crashes and injuries. Defendant FCA had directly received at least 279 complaints by this time.

36. This recall did not cure all of the TIPM defects in the '2007 Dodge Nitro, as demonstrated by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect concerning TIPM-related windshield wiper problems,

37. Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Vehicle, this recall demonstrates Defendant FCA's knowledge of the defective TIPM in the Vehicle.

38. This recall did not resolve the stalling problems caused by the faulty TIPM, as demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the complainant describes stalling in a MY 2007 Jeep Wrangler after having the recall repairs, and subsequently being told by a dealership service manager that the TIPM had to be replaced to cure the stalling problem (NHTSA ID No. 10217364.)

39. In June 2007, Defendant FCA released an emission recall, Recall 2007-15-E (G23) on certain vehicles equipped with the TIPM- 7. The recall was conducted to reprogram the vehicles' TIPM to prevent a condition where during some trips the vehicles would have only a single forward gear ratio available. Defendant FCA admitted that "[b]oth emissions and drivability would be affected when vehicle is stuck in one forward gear."

40. In May 2008, Defendant FCA distributed TSB 08-018-08 to its nationwide network of authorized dealers and service providers.

41.     This TSB is not publicly available, either in summary form or in its entirety, because neither Defendant FCA nor NHTSA classified the TIPM defect addressed in the TSB as a safety defect.

42.     The TSB covered several 2008 MY vehicles equipped with a TIPM-7.

43.     The TIPM defect purportedly resolved by this TSB involved data recording, specifically, the inability to record data because of TIPM software problems.

44.     The TSB states that "[d]ata recording is a valuable tool that provides assistance in diagnosing difficult to duplicate customer concerns. Some of the[se] models ... were incapable of utilizing the data recording features due to software compatibility concerns within the TIPM." In other words, Defendant FCA admitted internally that owners and lessees of these vehicles would suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the on board computer did not show that any mechanical "event" or "problem" had occurred. Any reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

45.     It is troubling that this TIPM defect has not been classified as a safety defect. Although the failure to record data itself does not appear to cause a loss of vehicle control and is probably unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of a safety defect, such as stalling, that would present a life-threatening safety hazard. Defendant FCA as well as consumers', ability to detect the manifestation of a safety defect was severely compromised by the inability to record data caused by the defective TIPM.

46.     Because the TIPM installed in these vehicles is the same as in the Vehicle, Defendant FCA was aware - yet again - that the TIPM installed in the Vehicle was defective, and chose a stop-gap remedy on a limited set of vehicles.

47.     Because the TSB was not publicly available, owners and lessees of these vehicles were unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

48.     By proceeding with a non-public TSB instead of a publicly announced safety recall, Defendant FCA chose to remain willfully blind about the manifestation of safety defects that a properly functioning TIPM would have enabled the data recorder to record.

49.     Rather than disclose the TIPM problem and offer an adequate solution, Defendant FCA attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

50.     In November 2009, Defendant FCA notified NHTSA of a safety defect affecting the windshield wiper system on certain vehicles equipped with the TIPM-7.

51.     The TIPM was defective in that a relay controlling the wipers could short out, causing the wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

52.     Defendant FCA recalled 84,680 vehicles to reprogram the TIPM.

53.     Because the TIPM in the vehicles subject to this recall and in the Vehicle is the same, this recall demonstrates that Defendant FCA knew, at the time that Plaintiff purchased or leased the Vehicle, that the TIPM was defective.

54.     In August 2011, Defendant FCA distributed TSB 08-053-11 to its nationwide network of authorized dealers and service providers.

55.     This TSB is not publicly available, either in summary form or in its entirety, because neither Defendant FCA nor NHTSA have classified the TIPM defect addressed in the TSB as a safety defect.

56.     This TSB covered numerous vehicles equipped with the TIPM.

57.     The TIPM was defective in that the vehicle theft alarm would intermittently sound for no apparent reason and the vehicles would fail to start.

58.     The TSB's purported fix was to flash reprogram the TIPM with new software.

59.     It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to cause the driver to lose control of the vehicle. Once again, Defendant FCA chose to address this problem internally rather than conduct a safety recall which would have

8

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

alerted its customers, NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

60.     Because the TIPM installed in these vehicles is the same as in the Vehicle, Defendant FCA was aware, once again, that the TIPM installed in the Subject Vehicle was defective, and again chose an inadequate stop-gap remedy on a limited set of vehicles.

61.     Rather than disclose the TIPM problem and offer an adequate solution, Defendant FCA attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

62.     In July 2013, Defendant FCA initiated yet another TIPM-related safety recall. Defendant FCA notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical overstress condition within the Occupant Restraint Controller Module ("ORCM"), which would in turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby increasing the risk of injury to a front seat occupant.

63.     Defendant FCA recalled approximately 442,481 vehicles to flash the TIPM or replace the ORCM, as required. The TIPM was flash reprogrammed in certain vehicles equipped with the TIPM-7.

64.     Once again, this recall evidences Defendant FCA's knowledge of the defective TIPM and shows FCA US LLC's repeated attempts to employ inadequate piecemeal remedies on the Subject Vehicle.

65.     On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with the [TIPM] installed in FCA US LLC SUCs, trucks, and vans beginning in the 2007 model year." The petition noted that TIPM failures result in a variety of safety-related problems, "many of which have the potential for destructive results," such as stalling, airbag non-deployment, failure of fuel- pump shutoff: and vehicle fires.

66.     CAS had received at least 70 complaints related to the TIPM in FCA US LLC vehicles and a stall/no-start condition was the most reported outcome of TIPM failure.

9

Seventeen of these complaints report engine stalling and 34 report a failure to start. Two of them report smoke and one reports a vehicle fire.

67. The· CAS petition asserts that FCA US LLC's previous TIPM-related recalls were insufficient "to address the TIPM problem widespread throughout FCA US LLC's fleet, instead focusing on a highly limited set of vehicles and circumstances."

68. Plaintiff has suffered the consequences of the TIPM failure described by CAS, and Plaintiff agrees with CAS's characterization of the TIPM problem as widespread throughout FCA US LLC's fleet and in the Vehicle.

69. On September 3, 2014, Defendant FCA notified NHTSA of yet another TIPM-related safety defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning or failure to start. In Defendant FCA's words, "[t]he vehicle may intermittently or permanently: not start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized upon vehicle shutdown," and "[a]n intermittent or failed fuel pump relay could cause the engine to stall while driving and cause a crash without a warning."

70. The remedy under Recall 14V-530 was to install a new fuel pump relay external to the TIPM. Defendant FCA may have decided that resolving the problem Within the TIPM was not feasible, given the extensive defects and problems within the TIPM.

71. The recall covered 188,723 vehicles equipped with the TIPM-7.

72. Yet again, this recall demonstrates Defendant FCA's knowledge that the TIPM in the Subject Vehicle was defective. And again, Defendant FCA chose to implement an inadequate piecemeal remedy.

73. On September 8, 2014, the CAS supplemented its defect petition with additional consumer complaints about the TIPM. In the supplement, the CAS identified 24 crashes from NHTSA's Early Warning Reporting ("EWR") database that the CAS believes may be related to TIPM failure. Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating Defendant FCA's awareness of these crashes.

STRATEGIC LEGAL PRACTICES, APC
1640 CENTURY PARK EAST, SUITE 450, LOS ANGELES, CA 90067

74.     On. September 25, 2014, NHTSA's ODI opened Investigation DP 14-004 to evaluate the CAS's detect petition. The investigation will "review allegations of [TIPM] failures resulting in engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or vehicle fire in certain ... vehicles ... equipped with TIPM-7 modules and manufactured by FCA US LLC Group LLC[.]"

75.     The ODI investigation covers approximately 4,800,000 vehicles equipped with the TIPM-7.

76.     On September 30, 2014, the CAS submitted another supplement to its defect petition, including approximately 25 new consumer complaints about the TIPM that it had received.

77.     With CAS's submission of its defect petition and supplements, and NHTSA's opening of the investigation, Defendant FCA is aware of an of the TIPM-related complaints made to the CAS. This is in addition to all of the TIPM-related complaints made to NHTSA about which Defendant FCA is, and has been, aware. At the very least, Defendant FCA has constructive knowledge of the consumer complaints submitted to NHTSA, which are publicly available on the NHTSA website.

78.     In response to a request for information by NHTSA, Defendant FCA stated the following in a December 12, 2014 letter to NHTSA:

a.  Defendant FCA had identified 709 reports which relate or may relate to the TIPM in the subject vehicles, representing 199 unique vehicle identification numbers ("VINs").

b.  FCA US LLC had identified 605 consumer complaints, made to FCA US LLC, which relate or may related to the TIPM .in the subject vehicles, representing 189 unique VINs. Defendant FCA did not specify when it received these complaints.

c.  Defendant FCA had identified 104 Field Reports which relate or-may relate to the TIPM in the subject vehicles; representing 65 unique VINs. Defendant FCA did not specify when it performed these field reports.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

---

11

**COMPLAINT; JURY TRIAL DEMANDED**

d.  Defendant FCA had identified 207 paid warranty claims related to repair or replacement of the TIPM-7 module, representing 126 unique VINs.

79.  In 2013, Defendant FCA conducted a safety recall of 2011 and 2012 model year Dodge Nitro and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM. The recall was prompted by the fact that the vehicles could experience illuminated airbag warning lamps and restraints not deploying in collisions.

80.  In that letter, Defendant FCA stated also that it had identified zero reports of crash, fire, injury, or fatality which relates or may relate to the TIPM in the subject vehicles. However, by the date of that letter consumers had submitted to NHTSA at least six reports describing crashes or fires in the relevant vehicles, rendering Defendant FCA's statement erroneous if not intentionally misrepresentative:

a.  On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447);

b.  On March 19, 2014, a consumer reported that the "wire:s and TIPM started melting and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No. 10573426);

c.  On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram 5500 ha. caught fire for the second time in a week and that the consumer had taken the truck to a dealership after the first fire (NHTSA ID No. 10573471);

d.  On June S, 2014, a consumer reported that a five-car pileup occurred immediately behind her because she stalled in the middle of the road due to a faulty TIPM in a MY 2011 Dodge Durango. (NHTSA ID No. 10596370).

e.  On September 18, 2014, a consumer reported that her MY 2011 Durango was "smoking" and that a dealership diagnosed the problem as an electrical short in the TIPM (NHTSA ID No. 1063717l).

f.  On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008 Jeep Wrangler (NHTSA ID No. 10651411).

COMPLAINT; JURY TRIAL DEMANDED

81.     Defendant FCA has knowledge of the fact that the defective TIPM installed in the Vehicle is prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

82.     Owners of vehicles equipped with a TIPM-7 have submitted at least 240 complaints to NHTSA about electrical problems including stalling, headlights turning off, and failure to start—most, if not all, of which occurred with no warning whatsoever to the driver.

83.     By the end of 2011, consumers had submitted over 100 complaints about the TIPM to NHTSA.

84.     Some of these complaints describe dangerous situations, indicating that Defendant FCA is putting the lives of consumers and their passengers at risk. When a defective TIPM suddenly fails without warning, a driver loses the ability to safely operate their vehicle.

85.     Many of the complaints to NHTSA were made prior to the sale of the Vehicle to Plaintiff.

86.     For years, Defendant FCA has monitored drivers' safety-related reports to NHTSA, which can be viewed on the NHTSA's website. There are several hundred complaints on the NHTSA website and elsewhere online dating back to when the TIPM-7 was first introduced in 2007 model year FCA US LLC vehicles.

87.     As early as 2008, drivers of vehicles equipped with the TIPM started contacting NHTSA to complain that their vehicles were experiencing a host of electrical issues, including uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and taillights not working. Drivers also complained that their vehicles would not start and that the vehicles would stall without warning. By the end of 2011, over 100 drivers had complained to NHTSA that they had experienced some combination of these symptoms, and dealers were diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM was already on a nationwide backorder.

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

88.     Defendant FCA's knowledge of the TIPM defect is also demonstrated by the fact that Defendant FCA studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent years, Defendant FCA has tested models for millions of miles before their release. For example, Defendant FCA employees put seven million miles on multiple 2011 Jeep Grand Cherokee test vehicles before production. Given the speed and frequency with which the TIPM defect manifests, it is not plausible that this testing would not have alerted Defendant to the existence of the TIPM defect. Only Defendant FCA however, has access to its pre-release testing data.

89.     Defendant FCA also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. Defendant FCA collects information from both drivers and dealerships, including through complaints, warranty claims, replacement parts data, and other aggregated data sources. Defendant FCA has exclusive access to this information also.

90.     Defendant FCA is collecting old TIPM parts that have been replaced, in an effort to keep those parts away from public scrutiny. Defendant FCA is requiring anyone who wants to purchase a new TIPM from Defendant FCA to agree to return to Defendant FCA the old TIPM that is being replaced.

91.     This requirement affects non-FCA mechanics and private individuals who seek to keep the original TIPM parts for any reason, including but not limited to examining those parts for defects.

92.     In addition, the owners of these vehicles already have paid for the original TIPM parts, and should not have to give up their personal property in order to buy a replacement part; this amounts to an abusive tactic.

93.     Notwithstanding the history of TIPM problems in its vehicles, Defendant FCA chose to begin installing the TIPM in 2007 model year vehicles and continued to install the TIPM into vehicles through the 2014 model year.

94.     Given the repeated, severe problems that plagued the TIPM in its vehicles, Defendant FCA understood that the TIPMs posed a heightened risk of problems for

14

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1   consumers and Defendant FCA was particularly aware of and on the lookout for early indicia

2   of TIPM problems.

3   **Defendant FCA's Failure to Disclose the TIPM Defect**

4       95.     FCA US LLC has never disclosed the TIPM defect to Plaintiffs prior to the

5   purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle and

6   Defendant FCA has never instructed its dealerships to disclose the TIPM defect to drivers or

7   potential purchasers or lessees of vehicles equipped with the TIPM.

8       96.     The TIPM defect was not known or reasonably discoverable to the Plaintiffs

9   before purchase or lease, or without experiencing the defect first hand and exposing

10  themselves to an unreasonable safety risk.

11      97.     Defendant FCA has remained silent even as it issued a service bulletin,

12  conducted internal investigations, and saw the TIPM replacement parts go on national

13  backorder and hundreds of complaints for effected vehicles were lodged with NHTSA.

14      98.     Defendant FCA's refusal to publicly acknowledge the defect has created

15  widespread confusion. Defendant FCA's failure to notify consumers, dealerships, or auto-

16  technicians prevents the TIPM problem from being efficiently diagnosed. Drivers often do not

17  realize that the symptoms they are experiencing are due to the TIPM defect or that prompt

18  action is needed to ensure they do not experience stalling, headlight loss, or other dangerous

19  symptoms in the future. Likewise, the lack of information makes it less likely that dealerships

20  and auto-technicians will be able to diagnose and fix the TIPM defect, or advise Plaintiffs

21  about the dangers of driving the Subject Vehicle.

22      99.     As a result of Defendant FCA's inaction and silence, Plaintiffs were entirely

23  unaware that Plaintiffs purchased, and continue to drive, an unsafe and unreliable vehicle.

24      100.    As Defendant FCA knows, a reasonable person would consider the TIPM

25  defect important and would not purchase or lease a vehicle equipped with the TIPM defect

26  were the defect disclosed in advance, or would pay substantially less for the vehicle.

27  ///

28  ///

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

## TOLLING OF THE STATUTES OF LIMITATION

101.    To the extent there are any statutes of limitation applicable to Plaintiffs'
claim—including, without limitation, his express warranty, implied warranty, and fraudulent
omission claims—the running of the limitation periods have been tolled by equitable tolling,
class action tolling (e.g. American Pipe rule) by the filing of Velasco et al v. Chrysler Group
LLC, United States District Court, Central District of California No. 2;13-cv-08080-DDP-
·VBK on November 1, 2013, the discovery rule, fraudulent concealment rule, equitable
estoppel, equitable tolling and/or repair rule.

A.      **Discovery Rule Tolling**

102.    Plaintiffs had no way of knowing about Defendant's deception with respect to
the TIPM Defect until the defect manifested itself and Defendant was unable to repair it after
a reasonable number of repair attempts.

103.    Within the time period of any applicable statutes of limitation, Plaintiffs could
not have discovered through the exercise of reasonable diligence that Defendant were
concealing the Defect and conduct complained of herein and concealing the companies' true
position with respect to the TIPM Defect.

104.    Plaintiffs did not discover, and did not know of, facts that would have caused a
reasonable person to suspect that Defendant had concealed information about the TIPM
Defect in the FCA Vehicles, which was discovered by Plaintiffs shortly before this action was
filed.

105.    Defendant was under a continuous duty to disclose to Plaintiffs the true
character, quality, and nature of the FCA Vehicles suffering from the TIPM Defect, and the
inevitable repairs, costs, time, and monetary damage resulting from the TIPM Defect.

### Some Pertinent Portions of Plaintiff's Repair History

106.    The following is a brief summary of some pertinent portions of the Subject
Vehicle's repair history.

107.    On or about December 2, 2015, with 16,598 miles on the odometer, Plaintiff
presented the Subject Vehicle to Defendant's repair facility Scott Robinson Chrysler Dodge

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

Jeep Ram in Torrance, California with complaints of the Vehicle's FOB key not working and the maps feature of the radio assembly not functioning. Defendant's repair facility confirmed Plaintiffs' concerns and determined that the radio assembly and key needed to be replaced. The key was replaced and a new radio assembly was ordered. Those repairs were conducted under warranty.

108.    On or about January 8, 2016, with 17,616 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's repair facility Scott Robinson Chrysler Dodge Jeep Ram in Torrance, California for installation of the radio assembly ordered on the previous repair visit as well as for performance of Recall R61, related to the ABS connector. Defendant's repair facility performed the Recall and installed the radio assembly. Those repairs were conducted under warranty.

109.    On or about February 6, 2017, with 32,231 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's repair facility Scott Robinson Chrysler Dodge Jeep Ram in Torrance, California with complaints the sunroof leaking and the GPS part of the radio assembly not working. Dealer's repair facility was unable to confirm the sunroof complaint but performed Recall R65 which was a radio software update. The repair was performed under warranty.

110.    On or about May 4, 2017, with 35,685 miles on the odometer, Plaintiff presented the Subject Vehicle to Defendant's repair facility Scott Robinson Chrysler Dodge Jeep Ram in Torrance, California again with complaints of the radio assembly not working and the check engine light being on. This time, the repair facility again replaced the radio assembly and determined that there was a small evap leak. The other repairs were performed under warranty.

111.    Thereafter, Plaintiffs continued to experience symptoms of the TIPM Defect despite Defendant's representations that the various defects were repaired.

112.    Plaintiffs discovered Defendant's wrongful conduct alleged herein on or about April 2019 when they requested a buyback and/or restitution of the Subject Vehicle from FCA, as the Vehicle continued to exhibit symptoms of the TIPM Defect following FCA's

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

17

unsuccessful attempts to repair it.  However, FCA failed to provide restitution pursuant to the Song-Beverly Consumer Warranty Act.

113.    Plaintiffs had no way of knowing about Defendants' deception with respect to the TIPM Defect.

114.    Within the time period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Defect and conduct complained of herein and misrepresenting the companies' true position with respect to the TIPM Defect.

115.    Plaintiffs did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants had concealed information about the TIPM Defect in the FCA Vehicles at the time of sale and thereafter, which was discovered by Plaintiffs shortly before this action was filed.

116.    Making it even more difficult to discover that the Subject Vehicle's engine suffered from a safety defect was Defendant's issuance of various TSBs and Recalls purporting to be able to fix the symptoms of the TIPM Defect and/or that such symptoms were not the result of a defect.

117.    Defendants were under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of the FCA vehicles suffering from the TIPM Defect, and the inevitable repairs, costs, time, and monetary damage resulting from the TIPM Defect.

## FIRST CAUSE OF ACTION

## BY PLAINTIFFS AGAINST DEFENDANT FCA

## VIOLATION OF SUBDIVISION (D) OF CIVIL CODE SECTION 1793.2

118.    Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

119.    Defendant and its representatives in this state have been unable to service or repair the Vehicle to conform to the applicable express warranties after a reasonable number of opportunities.  Despite this fact, Defendant failed to promptly replace the Vehicle or make

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1  restitution to Plaintiffs as required by Civil Code section 1793.2, subdivision (d) and Civil

2  Code section 1793.1, subdivision (a)(2).

3      120.   Plaintiffs have been damaged by Defendant's failure to comply with its

4  obligations pursuant to Civil Code section 1793.2, subdivision (d) and Civil Code section

5  1793.1, subdivision (a)(2), and therefore brings this cause of action pursuant to Civil Code

6  section 1794.

7      121.   Defendant's failure to comply with its obligations under Civil Code section

8  1793.2, subdivision (d) was willful, in that Defendant and its representative were aware that

9  they were unable to service or repair the Vehicle to conform to the applicable express

10  warranties after a reasonable number of repair attempts, yet Defendant failed and refused to

11  promptly replace the Vehicle or make restitution. Accordingly, Plaintiffs are entitled to a civil

12  penalty of two times Plaintiffs' actual damages pursuant to Civil Code section 1794,

13  subdivision (c).

14      122.   Defendant does not maintain a qualified third-party dispute resolution process

15  which substantially complies with Civil Code section 1793.22. Accordingly, Plaintiffs are

16  entitled to a civil penalty of two times Plaintiffs' actual damages pursuant to Civil Code

17  section 1794, subdivision (e).

18      123.   Plaintiffs seek civil penalties pursuant to section 1794, subdivisions (c), and (e)

19  in the alternative and does not seek to cumulate civil penalties, as provided in Civil Code

20  section 1794, subdivision (f).

### SECOND CAUSE OF ACTION

### BY PLAINTIFFS AGAINST DEFENDANT FCA

### VIOLATION OF SUBDIVISION (B) OF CIVIL CODE SECTION 1793.2

24      124.   Plaintiffs incorporate by reference the allegations contained in the paragraphs

25  set forth above.

26      125.   Although Plaintiffs presented the Vehicle to Defendant's representative in this

27  state, Defendant and its representative failed to commence the service or repairs within a

28  reasonable time and failed to service or repair the Vehicle so as to conform to the applicable

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**

1  warranties within 30 days, in violation of Civil Code section 1793.2, subdivision (b).

2  Plaintiffs did not extend the time for completion of repairs beyond the 30-day requirement.

3       126.   Plaintiffs have been damaged by Defendant's failure to comply with its

4  obligations pursuant to Civil Code section 1793.2(b), and therefore brings this Cause of

5  Action pursuant to Civil Code section 1794.

6       127.   Plaintiffs have rightfully rejected and/or justifiably revoked acceptance of the

7  Vehicle, and have exercised a right to cancel the purchase.  By serving this Complaint,

8  Plaintiffs do so again.  Accordingly, Plaintiffs seek the remedies provided in California Civil

9  Code section 1794(b)(1), including the entire contract price.  In the alternative, Plaintiffs seek

10  the remedies set forth in California Civil Code section 1794(b)(2), including the diminution in

11  value of the Vehicle resulting from its defects.  Plaintiffs believe that, at the present time, the

12  Vehicle's value is *de minimis.*

13       128.   Defendant's failure to comply with its obligations under Civil Code section

14  1793.2(b) was willful, in that Defendant and its representative were aware that they were

15  obligated to service or repair the Vehicle to conform to the applicable express warranties

16  within 30 days, yet they failed to do so.  Accordingly, Plaintiffs are entitled to a civil penalty

17  of two times Plaintiffs' actual damages pursuant to Civil Code section 1794(c).

18                    **THIRD CAUSE OF ACTION**

19              **BY PLAINTIFFS AGAINST DEFENDANT FCA**

20     **VIOLATION OF SUBDIVISION (A)(3) OF CIVIL CODE SECTION 1793.2**

21       129.   Plaintiffs incorporate by reference the allegations contained in paragraphs set

22  forth above.

23       130.   In violation of Civil Code section 1793.2, subdivision (a)(3), Defendant failed

24  to make available to its authorized service and repair facilities sufficient service literature and

25  replacement parts to effect repairs during the express warranty period.  Plaintiffs have been

26  damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section

27  1793.2(a)(3), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

28

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

**COMPLAINT; JURY TRIAL DEMANDED**

1    131.   Defendant's failure to comply with its obligations under Civil Code section

2  1793.2, subdivision (a)(3) was wilful, in that Defendant knew of its obligation to provide

3  literature and replacement parts sufficient to allow its repair facilities to effect repairs during

4  the warranty period, yet Defendant failed to take any action to correct its failure to comply

5  with the law. Accordingly, Plaintiffs are entitled to a civil penalty of two times Plaintiffs'

6  actual damages; pursuant to Civil Code section 1794(c).

7                      **FOURTH CAUSE OF ACTION**

8                  **BY PLAINTIFFS AGAINST DEFENDANT FCA**

9                  **BREACH OF EXPRESS WRITTEN WARRANTY**

10                  **(CIV. CODE, § 1791.2, SUBD. (a); § 1794)**

11    132.   Plaintiffs incorporate by reference the allegations contained in paragraphs set

12  forth above.

13    133.   In accordance with Defendant's warranty, Plaintiffs delivered the Vehicle to

14  Defendant's representative in this state to perform warranty repairs. Plaintiffs did so within a

15  reasonable time. Each time Plaintiffs delivered the Vehicle, Plaintiffs notified Defendant and

16  its representative of the characteristics of the Defects. However, the representative failed to

17  repair the Vehicle, breaching the terms of the written warranty on each occasion.

18    134.   Plaintiffs have been damaged by Defendant's failure to comply with its

19  obligations under the express warranty, and therefore brings this Cause of Action pursuant to

20  Civil Code section 1794.

21    135.   Defendant's failure to comply with its obligations under the express warranty

22  was willful, in that Defendant and its authorized representative were aware that they were

23  obligated to repair the Defects, but they intentionally refused to do so. Accordingly, Plaintiffs

24  are entitled to a civil penalty of two times of Plaintiffs' actual damages pursuant to Civil Code

25  section 1794(c).

26  ///

27  ///

28  ///

**COMPLAINT; JURY TRIAL DEMANDED**

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

## FIFTH CAUSE OF ACTION

## BY PLAINTIFFS AGAINST DEFENDANTS

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

## (CIV. CODE, § 1791.1; § 1794; § 1795.5)

136.    Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

137.    Pursuant to Civil Code section 1792, the sale of the Vehicle was accompanied by Defendant's implied warranty of merchantability.  Pursuant to Civil Code section 1791.1, the duration of the implied warranty is coextensive in duration with the duration of the express written warranty provided by Defendant, except that the duration is not to exceed one-year.

138.    Pursuant to Civil Code section 1791.1 (a), the implied warranty of merchantability means and includes that the Vehicle will comply with each of the following requirements:  (1) The Vehicle will pass without objection in the trade under the contract description; (2) The Vehicle is fit for the ordinary purposes for which such goods are used; (3) The Vehicle is adequately contained, packaged, and labelled; (4) The Vehicle will conform to the promises or affirmations of fact made on the container or label.

139.    At the time of purchase, or within one-year thereafter, the Vehicle contained or developed the defects set forth above. The existence of each of these defects constitutes a breach of the implied warranty because the Vehicle (1) does not pass without objection in the trade under the contract description, (2) is not fit for the ordinary purposes for which such goods are used, (3) is not adequately contained, packaged, and labelled, and (4) does not conform to the promises or affirmations of fact made on the container or label.

140.    Plaintiffs have been damaged by Defendant's failure to comply with its obligations under the implied warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

///

///

///

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

COMPLAINT; JURY TRIAL DEMANDED

**SIXTH CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANT FCA**

**FRAUDULENT INDUCEMENT – CONCEALMENT**

141.    Plaintiffs incorporate by reference the allegations contained in the paragraphs set forth above.

142.    Defendant FCA concealed a known defect from Plaintiffs. The defective component is called the totally integrated power module (or TIPM). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle-everything from steering and brakes, to the alarm, headlights, and the fuel pump.

143.    Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles incapable of providing reliable or safe transportation. This defect may cause a vehicle to fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds. The TIPM defect has caused headlights and taillights to suddenly shut off. It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

144.    Defendant FCA concealed and suppressed material facts to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that Defendant FCA was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.

145.    Defendant FCA's deceptive omissions infected all purchases and leases of vehicles equipped with the TIPM, regardless of whether the vehicles were used or new at the time of acquisition.

146.    As early as 2007, Defendant FCA knew of the TIPM defects, Defendant FCA had ample opportunity to communicate to the public, its dealerships, and government regulators in a fashion that would have informed the car-buying public about the TIPM

**COMPLAINT; JURY TRIAL DEMANDED**

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1  defects in vehicles equipped with the TIPM. For example, Defendant FCA could have recalled

2  the vehicles.

3      147.    Plaintiffs reasonably, justifiably, and detrimentally relied on Defendant FCA's

4  silence about the TIPM defect when deciding whether to purchase or lease a vehicle equipped

5  with a TIPM, in part because Defendant FCA was, and still is, in a position of superior

6  knowledge about the TIPM defects. Plaintiffs reasonably trusted that Defendant FCA would

7  not sell a dangerously defective vehicle or fail to recall those vehicles - or otherwise make

8  widely known that the vehicles were dangerously defective such that current and prospective

9  owners and lessees could make informed decisions to protect themselves and their families.

10      148.    Defendant FCA acted with malice and a willful and conscious disregard for the

11  rights and safety of the Plaintiffs and the public in committing these fraudulent acts.

12      149.    Defendant FCA had, and still has, a duty to disclose the TIPM defects because

13  they were known and/or accessible only to Defendant FCA, which had superior knowledge

14  and access to the relevant facts, and because Defendant FCA knew that the relevant facts were

15  not known or reasonably discoverable by Plaintiffs.

16      150.    Under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"),49

17  U.S.C. §§30101-30183, Defendant FCA had the duty to disclose the TIPM defects to NHTSA,

18  and by extension and implication to the public. *Id.* §30118(c). If Defendant FCA had disclosed

19  the TIPM defects to NHTSA, NHTSA would have made that information public on its

20  websites (www.safecar.gov and www.nhtsa.dot.gov) and its automobile safety telephone

21  hotline.

22      151.    Defendant FCA still has not made full and adequate disclosure and continues

23  to defraud Plaintiffs by concealing material information regarding the TIPM defects that exist

24  in the Vehicle and the risks posed by those defects.

25      152.    Defendant FCA actively concealed and/or suppressed these material facts, in

26  whole or in part, to protect its profits and avoid recalls that would have hurt the brand's image

27  and cost Defendant FCA money, and it did so at the expense of Plaintiffs.

28

STRATEGIC LEGAL PRACTICES, APC
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

153.    Because Defendant FCA knew that any reasonable consumer would not purchase a vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and Defendant FCA was concealing material information about the TIPM defects, Defendant FCA must have known that Plaintiffs was acting on the basis of mistaken knowledge that their vehicles were safe and reliable when they decided to purchase or lease them at market price (without a discount to reflect that they contained a defective TIPM).

154.    Plaintiffs could not have discovered the TIPM defect because Defendant FCA kept all testing information confidential.

155.    Defendant FCA actively concealed an important fact from Plaintiffs or prevented her from discovering that fact and as a result, Plaintiffs did not know about the TIPM defect.

156.    Defendant FCA intended to deceive Plaintiffs by continuing to market the Vehicle and concealing the existence of a known TIPM defect which posed major safety concerns.

157.    Had the information been disclosed, Plaintiffs reasonably would have behaved differently.

158.    Plaintiffs was harmed by Defendant FCA's concealment of the TIPM defect and was a substantial factor in causing Plaintiffs' harm. The concealment substantially influenced Plaintiffs' purchase of the Subject Vehicle. Plaintiffs would not have purchased the Subject Vehicle had the TIPM defect been disclosed prior to sale.

159.    The concealed TIPM defect was material.

///

///

///

///

///

///

///

25

COMPLAINT; JURY TRIAL DEMANDED

**PRAYER**

PLAINTIFFS PRAY for judgment against Defendant as follows:

     a.  For Plaintiffs' actual damages in an amount according to proof;

     b.  For restitution;

     c.  For a civil penalty in the amount of two times Plaintiffs' actual damages pursuant to Civil Code section 1794, subdivision (c) or (e);

     d.  For any consequential and incidental damages;

     e.  For costs of the suit and Plaintiffs' reasonable attorneys' fees pursuant to Civil Code section 1794, subdivision (d);

     f.  For prejudgment interest at the legal rate;

     g.  For punitive damages; and

     h.  For such other relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all causes of action asserted herein.

Dated: July 29, 2019                STRATEGIC LEGAL PRACTICES, APC

BY: _____

Tionna Dolin
Attorney for Plaintiffs
JASON J. ARNOLD and MELISSA L.
ARNOLD

**COMPLAINT; JURY TRIAL DEMANDED**